UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
EZ PAWN CORP. and ALOAMAKA
ONWUAKOR,

                     Plaintiffs,           **MEMORANDUM & ORDER**
                                              16-CV-3852 (PKC) (SMG)

          - against -

CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, and NEW YORK
CITY POLICE DEPARTMENT OFFICER
JONATHAN BULZOMI,

                    Defendants.
----------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiffs EZ Pawn Corp. ("EZ Pawn") and Aloamaka Onwuakor (collectively, "Plaintiffs") bring this action against Defendants New York City Police Department ("NYPD"), NYPD Officer Jonathan Bulzomi ("Defendant Bulzomi"), and the City of New York (collectively, "Defendants"), advancing several claims under 42 U.S.C. § 1983 and New York law. Defendants move for summary judgment on all of Plaintiffs' claims. For the following reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.

## BACKGROUND

### I. State & Local Law Governing Pawnbrokers & Second-hand Dealers

In New York City, collateral loan brokers—more commonly referred to as pawnbrokers[1]— and second-hand dealers[2] operate under a statutory framework that includes provisions of the New

---

[1] "A pawnbroker is one whose business is to lend money, usually in small sums, upon a pawn or pledge." *Bernstein v. Weinstein*, 93 N.Y.S. 1121, 1121 (N.Y. App. Div. 1905).

[2] A second-hand dealer is "any person who, in any way or as a principal broker or agent [] [d]eals in the purchase or sale of second-hand articles of whatever nature." *New York v. Burger*, 482 U.S. 691, 707 (1987) (quoting N.Y.C. Charter & Admin. Code § B32-126.0a).

York State General Business Law ("GBL"), the New York City Charter, the New York City Code, and the Rules and Regulations of the City of New York. *See, e.g.*, N.Y. Gen. Bus. Law ch. 10, art. 5 (regulating collateral loan brokers). Of relevance here, GBL § 43 requires pawnbrokers to keep a book with certain information about loans and collateral. *See* N.Y. Gen. Bus Law § 43. Meanwhile, GBL § 45 authorizes warrantless searches of certain records maintained by pawnbrokers and specifically provides that these records

> shall at all reasonable times be open to the inspection of the attorney general, the state comptroller, the mayor or local licensing authority, all judges of the criminal courts, the superintendent of police, police inspectors, captains of police and police justices of such cities, or any or either of them, or of any person who shall be duly authorized in writing for that purpose by any or either of them, and who shall exhibit such written authority to such collateral loan broker. The mayor or the licensing authority of any local governing body, the state comptroller, the attorney general and any person duly authorized by them shall have the power to administer oaths and to examine under oath any such collateral loan broker or any officer, or agent, of such collateral loan broker and any other person having custody or control of such books and records. Such books and records shall be retained in the possession of the collateral loan broker, in good condition and in an orderly fashion for at least a period of six years.

N.Y. Gen. Bus. Law § 45. Additionally, New York City law empowers the NYPD Police Commissioner to conduct administrative searches[3] of certain trades, including pawnbrokers and second-hand dealers:

> The commissioner shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers, vendors, junkshop keepers, junk boatmen[], cartmen, dealers in second-hand merchandise and auctioneers within the city; and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession. A refusal or neglect to comply in any respect with the provisions of this section on the part of any pawnbroker, vendor, junkshop keeper, junk boatman, cartman, dealer in second-hand merchandise or auctioneer, or any clerk or employee of any thereof

---

[3] An "administrative search" is a search "made for the purpose of inventory or administrative regulation," *Anobile v. Pelligrino*, 303 F.3d 107, 122 (2d Cir. 2002), and is distinguishable from a "search[] for evidence of a crime," *Young v. Suffolk Cty.*, 922 F. Supp. 2d 368, 391 n.8 (E.D.N.Y. 2013).

shall be triable by a judge of the criminal court and punishable by not more than thirty days' imprisonment, or by a fine of not more than fifty dollars, or both.

N.Y. City Charter § 436.[4] Moreover, § 20-277 of the New York City Code[5] imposes reporting

requirements on pawnbrokers:

> The police commissioner, at such times as he or she may prescribe in a written notice served upon any pawnbroker by a member of the police department, may in addition to the electronic record required by subdivision [(a)] of this section[6] require such pawnbroker to report to such commissioner, upon blank forms to be furnished by the police department, a description of all goods, articles or things, or any part thereof, pawned or pledged in the course of business of such pawnbroker during the days specified in such notice, stating the numbers of the pawn tickets issued therefor, the amounts loaned thereon, and such identifying marks as may be on the goods pawned. If such notice from the police commissioner so prescribes, such pawnbroker, until he or she is notified to discontinue so doing, shall keep and furnish on such forms, identifying information regarding any pledgors or persons redeeming any articles pledged or pawned, including name, address, phone number, date of birth, sex, and race or ethnicity.

---

[4] The portion of § 436 that authorizes a warrantless inspection scheme was found unconstitutional in *Gem Financial Service, Inc. v. City of New York*, 298 F. Supp. 3d 464 (E.D.N.Y. 2018). Though the Court considers this holding persuasive, *Gem Financial* is not binding on this Court. *See L.S. v. Webloyalty.com, Inc.*, No. 3:10-CV-1372 (CSH), 2014 WL 3547640, at *5 (D. Conn. July 17, 2014) (noting that the district court is "not bound by the decisions of any other district court in the nation, nor by the decisions of any circuit court other than the Second"). Additionally, the *Gem Financial* defendants have not yet had the opportunity to appeal because the case is still pending. *See Ortiz v. Jordan*, 562 U.S. 180, 188 (2011) ("Ordinarily, orders denying summary judgment do not qualify as final decisions subject to appeal." (quotation omitted)). Notably, in this lawsuit, Plaintiff EZ Pawn is not seeking to have any portion of § 436 declared facially unconstitutional, but rather, is asserting an as-applied challenge to that statute and other regulatory provisions pursuant to which the allegedly unconstitutional searches of EZ Pawn's stores were conducted.

[5] Several provisions of the New York City Administrative Code governing the record-keeping requirements for pawnbrokers and second-hand dealers were amended in December 2013 by the passage of Local Law 149. (Defendants' Affidavit & Declaration in Support of Motion for Summary Judgment ("Defs.' Aff. & Decl."), Dkt. 45-4, at ECF 383–90.) The Court considers the updated version for the purposes of this Order.

[6] Subdivision (a) requires "[e]very pawnbroker" to "create an electronic record in English, in a manner to be specified by the police commissioner by rule." N.Y. City Code § 20-277(a). Section 20-273 similarly requires "every dealer in second-hand articles" to "keep a written record of transactions that shall be legible and written in English." *Id.* § 20-273(a).

N.Y. City Code § 20-277(3)(b). These records "shall be open to the inspection of any police officer, the commissioner or any departmental inspector, judge of the criminal court, or person duly authorized in writing for such purposes by the commissioner by any judge of the criminal court, who shall exhibit such written authority to the dealer." *Id.* § 20-273(2)(e).

Finally, a non-binding memorandum authored by George A. Grasso, Former Deputy Commissioner of Legal Matters at the NYPD (the "Grasso Memo"), sets forth the following guidelines:

> Although the Administrative Code and the Rules of the City of New York give this Department the authority to perform administrative searches of the books and records of pawnbrokers and second-hand dealers, such authority must not be used to circumvent the warrant requirements of the United States and New York State Constitutions. The New York State Court of Appeals reviewed the [c]onstitutional implications of administrative searches in the landmark decision *People v. Keta*,[7] [which] held that in order to survive a constitutional challenge, an administrative inspection program . . . must be conducted pursuant to a comprehensive, systematic regulatory scheme. In addition, the type of business being inspected must [be] one that is closely regulated by the government, the government must have a substantial government interest in enforcing the administrative regulations, and, most importantly, any warrantless inspections must be necessary to further the objectives of the inspection program. The *Keta* court further stated that, administrative inspections should be designed to uncover administrative violations, not criminal activity. . . .
>
> Thus, in order to [e]nsure that administrative searches of pawnbroker and second-hand dealer businesses conducted by this Department survive constitutional challenge, Department guidelines must [e]nsure that such searches are necessary to further the objective of enforcing the rules and regulations pertaining to such businesses. Members of the service may inspect the books and records of

---

[7] 593 N.E.2d 1328 (N.Y. 1992) (holding that N.Y. Veh. & Traf. Law § 415-(a)(5), which permitted the NYPD to conduct warrantless searches of vehicle-dismantling businesses, was unconstitutional under New York's Constitution). "In [*Keta*], the New York Court of Appeals heard appeals from two cases, *People v. Scott*[, 565 N.Y.S.2d 576 (N.Y. App. Div. 1991),] and *People v. Keta*[, 567 N.Y.S.2d 738 (N.Y. App. Div. 1991)]. Both dealt with the constitutionality of police searches under state law." *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 278 n.1 (S.D.N.Y. 2008). Before *Keta*, the United States Supreme Court had held that New York Vehicle & Traffic Law § 415-(a)(5) did not violate the Fourth Amendment's proscription of unreasonable searches and seizures. *See Burger*, 482 U.S. at 712–16.

pawnbroker and second-hand dealer businesses, request to see required licenses, [and] demand to examine and seize stolen property. Such inspections should be conducted on a regular basis as part of an ongoing program to enforce licensing and record[-]keeping requirements. . . . Inspections or searches, conducted for the purpose of finding evidence of criminal activity must be conducted pursuant to a search warrant or exception to the search warrant requirement, *i.e.*[,] consent or plain view. In addition, when an administrative search of a pawnbroker or second-hand dealer's book or records indicates the presence [of] criminal activity, the premises should be secured and a search warrant obtained.

(Grasso Memo, Dkt. 45-2, at ECF[8] 230 (emphasis omitted); *see also id.* at ECF 233–34 (enumerating eleven guidelines for police officers assigned to inspect pawnbroker and second-hand dealer businesses).)

## II. Facts[9]

### A. NYPD's Use of LeadsOnline

From 2010 to 2013, the NYPD provided pawnbrokers and second-hand dealers with two options as to the manner in which they could record and maintain required transactional information: (1) record the required information in log books provided by the NYPD; or (2) report

---

[8] "ECF" refers to the "Page ID" number generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[9] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a party's 56.1 statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document. The Court has deemed facts averred in a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed. *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)). Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement. *Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).

and maintain the information electronically on LeadsOnline, the web-based electronic data transfer

service engaged by the NYPD to serve as the repository of electronic records. (Defendants' 56.1

Statement ("Defs.' 56.1"), Dkt. 44, ¶ 19; Defs.' Aff. & Decl., Dkt. 45-2, at ECF 245–46; Defs.'

Aff. & Decl., Dkt. 45-3, at ECF 319.) As the NYPD's "Patrol Guide,"[10] promulgated on August 1,

2013 explains:

> All pawnbrokers and second-hand dealers are required to report on specified
> Department forms all articles pawned, purchased, or sold. Pawnbrokers and
> second-hand dealers participating in, and actively uploading transactions to,
> [LeadsOnline] are exempt from the requirement of manually filling out and
> preserving logs for inspection. By actively uploading their transactions on a daily
> basis, participating stores are allowing their records to be inspected via
> [LeadsOnline]. Stores are requested to upload the day's transactions by the close
> of business each day.

(Patrol Guide, Dkt. 45-2, at ECF 241.)[11] With the passage of Local Law 149 in 2013, use of

LeadsOnline became required for pawnbrokers and second-hand dealers. (*Cf.* Defs.' Aff. & Decl.,

Dkt. 45-4, at ECF 351.) However, on October 10, 2014, the requirements established by Local

Law 149 were temporarily suspended pending the outcome of litigation.[12] (*Id.*) On June 15, 2017,

after the litigation had terminated, enforcement of Local Law 149 resumed. (*Id.* at ECF 321.)

---

[10] The Patrol Guide, which aims to "establish a systemic inspection of pawnbrokers and second-hand dealers by patrol precincts," provides "guidelines to officers on the retention and review of electronic records uploaded by pawnbrokers and second-hand dealers to an online database." *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 476. The record is silent as to whether the Patrol Guide is binding on NYPD officers and what consequences NYPD officers face for violations of its provisions.

[11] A prior version of the Patrol Guide was issued on September 26, 2012. (Ex. F, Defs.' Aff. & Decl., Dkt. 45-2, at ECF 235–39.) For the purposes of this Order, the Court refers to the more recent version.

[12] *See Collateral Loanbrokers Ass'n of N.Y., Inc. v. City of New York*, No. 303901/14, 2015 WL 3500068 (N.Y. Sup. Ct. June 3, 2015), *rev'd*, 46 N.Y.S. 3d 600 (N.Y. App. Div. 2017). In *Collateral Loanbrokers*, the New York Supreme Court, Bronx County, found that the plaintiff pawnbrokers were likely to succeed on the merits on their state-law challenge to Local Law 149. 2015 WL 3500068, at *3. On appeal, the New York Appellate Division, First Department,

When a pawnbroker or second-hand dealer uses LeadsOnline, the NYPD is able to review the required records and check recent items electronically without visiting the stores, and is also able to request "holds"[13] electronically. (Defs.' 56.1, ¶ 21.) On the other hand, when a pawnbroker or second-hand dealer records the required information in log books instead of LeadsOnline, it is the NYPD's practice to periodically visit the premises to review the required records. (*Id.* ¶ 22.) The NYPD also visits the premises of pawnbrokers and second-hand dealers not using LeadsOnline to investigate reported stolen property and, where necessary, request a hold on that property. (*Id.*)

Regardless of whether a pawnshop or second-hand dealer uses LeadsOnline, it is the NYPD's practice to make unannounced visits to the premises of pawnbrokers and second-hand dealers at random times.[14] When asked at deposition what NYPD officers do in the course of these inspections, Sergeant Cecchini answered:

> It depends, I would be given a list of tasks, you know, to see if [the pawnshops or second-hand dealers were] in accordance with the Leads[]Online books, if they, you know, mostly it's, you know, if they have the proper signage, if they are putting

---

reversed. *See* 46 N.Y.S. 3d at 602 ("We now reverse the motion court's order, and conclude that the challenged statutory and regulatory scheme does not violate the New York State Constitution's proscription against unreasonable searches and seizures.").

[13] When an item is placed on hold, it is "secured" by the police, *We Buy, Inc. v. Town of Clarkstown*, No. 06-CV-1794 (LBS), 2006 WL 3016314, at *2 (S.D.N.Y. Oct. 20, 2006), and although the pawnshop "retain[s] physical possession of" the item, the pawnshop cannot "sell, alienate, or even destroy the property at issue," *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 486 (quotation and ellipsis omitted).

[14] When asked at deposition why the NYPD chose to inspect certain pawnshops at certain times, Defendant Bulzomi explained: "If we [NYPD officers] just pass and I see a pawnshop, if we just so happen to pass one, 'oh, let me do this now, do an inspection now.' So, just to do one." (Deposition of Jonathan Bulzomi ("Bulzomi Dep."), Dkt. 47-3, at ECF 492–93.) Although Defendant Bulzomi conceded that the timing of these administrative inspections was random (*id.*), NYPD Sergeant Timothy Cecchini testified that it was practice for the NYPD Lieutenant to request that an officer conduct an inspection as certain businesses "came up on the list for an inspection" (Deposition of Timothy Cecchini ("Cecchini Dep."), Dkt. 47-4, at ECF 590).

proper descriptions of items, serial numbers of phones, descriptive markings, if they're properly marking things, if they're taking pictures of the items and things of that nature are things we would inspect for. . . .

I, again, we had to look through an X amount of tickets per inspection and, again, we just tried to make sure that they were in accordance with the basic thing that would help us in solving crimes. We didn't really venture too far off into the, you know, obviously the admin guide from New York State and New York City for pawnbrokers is extensive, so we would try to keep our scope narrowly related to things that are, you know, applicable to, you know, crime victims and things of that nature. . . .

[W]e announced ourselves when we entered, there would be no, you know, we wouldn't give a phone call. We would announce when we walked in, you know, good afternoon, my name is Sergeant Cecchini, New York Police Department, I'm conducting a random inspection of your book, or whatever the case might be, which they were, most people were familiar with.

(Cecchini Dep., Dkt. 47-4, at ECF 589, 591–93.) These visits were ostensibly executed pursuant

provisions in the NYPD's Patrol Guide, which provides:

When designated to perform inspections of pawnbrokers/second-hand dealers by a competent authority, [the NYPD shall]:

1. Designate [a] special operations lieutenant as the primary coordinator of the command's pawnbroker/second-hand dealer inspection program. . . .

2. Maintain an updated list of all pawnbrokers and second-hand dealers operating within [the] confines of [a] precinct[:] [a:] Divide [the] list into two separate categories, delineating between the stores which keep records updated using [LeadsOnline], and those stores which maintain manual records[; b:] Provide [a] copy of [the] list to [various NYPD officers][; c:] Revise [the] list quarterly to ensure accuracy.

3. Designate appropriate uniformed member(s) of the service as a liaison with pawnbrokers and second-hand dealers.

4. Provide each pawnbroker and second-hand dealer with copies of SECOND-HAND ARTICLES STORE LOG (PD530-141), if store does not participate in [LeadsOnline]. [] Provide second-hand dealers with copy of INSTRUCTIONS TO DEALERS IN SECOND[-]HAND ARTICLES (PD634-153), in all cases.

5. Visit each store maintaining manual records at least once every ten days, and document visit by signing next unused transaction receipt in the SECOND-HAND ARTICLES STORE LOG.

6. Remove precinct detective squad (pink) copy of completed transactions from the SECOND-HAND ARTICLES STORE LOG, if applicable, and immediately deliver to precinct detective squad commander, or in his/her absence, another precinct detective squad supervisor.

7. When applicable, designate a member of the precinct detective squad to perform required computer checks of individuals identified as recidivists, parolees, probationers, or known burglary perpetrators who are selling or pawning items.

8. Ensure prompt investigation is conducted to match potentially stolen property against property previously reported stolen in precinct and surrounding areas. [] Assign a member of detective squad to visit store to request a hold on specified property pending completion of investigation, if necessary.

9. Monitor [LeadsOnline] on a weekly basis, paying particular attention to repeated transactions by an individual, or other signs indicative of criminal behavior.

10. Disseminate to appropriate units information obtained from the "Persons of Interest" list generated by [LeadsOnline].

11. Review list and routinely visit all pawnbrokers and second-hand dealers located in confines of precinct[: a] Encourage use of [LeadsOnline] among stores maintaining manual records[; b:] Monitor [LeadsOnline] to ensure that participating stores are uploading data on a daily basis.

12. Ensure integrity of entries made by pawnbroker/second-hand dealer into the SECOND-HAND ARTICLES STORE LOG or [LeadsOnline], as applicable[: a:] Request to see last twenty articles purchased or pawned by pawnbroker/second-hand dealer[; b:] Compare the articles to the descriptions as listed in SECOND-HAND ARTICLES STORE LOG or database entry, as applicable. . . .

(Patrol Guide, Dkt. 45-2, at ECF 241–43 (underlines and capitalizations in original).)

### B. EZ Pawn & the NYPD

EZ Pawn is a licensed pawnbroker and second-hand dealer that maintains fifteen locations in New York City. (Defs. 56.1, ¶¶ 10–11; Plaintiffs' Affidavit & Declaration in Opposition to Motion for Summary Judgment ("Pls.' Aff. & Decl."), Dkt. 47-1, at ECF 421.) EZ Pawn began using LeadsOnline in 2009. (Defs.' 56.1, ¶ 24.) In 2012, EZ Pawn temporarily discontinued and subsequently resumed use of LeadsOnline. (*Id.*) EZ Pawn discontinued its use of LeadsOnline

for a final time in 2015. (*Id.*) David Kaminsky, Chief Executive Officer of EZ Pawn, testified at deposition that EZ Pawn resumed use of LeadsOnline in 2012,

> [b]ecause we were being—my managers were complaining that the police were coming in and saying to them, "If you don't—we want you to go on LeadsOnline, and if you don't go on LeadsOnline, we're going to be here every week. We're going to stay outside your door. We're going to check your books and records, and we're going to want you to do things that you don't want to do."

(Deposition of David Kaminsky ("Kaminsky Dep."), Dkt. 45-2, at ECF 217, 219.)[15]

At deposition, EZ Pawn store manager Linda Cabrera testified that, when EZ Pawn was using LeadsOnline, NYPD officers came to the EZ Pawn store located on Queens Boulevard in Queens, NY (the "Queens location") roughly twice a week to check the items and transactions, and to ensure that LeadsOnline was being used properly. (Defs.' 56.1, ¶ 37; Deposition of Linda Cabrera ("Cabrera Dep."), Dkt. 45-2, at ECF 262, 265). Ms. Cabrera testified that, during the periods in which EZ Pawn was not using LeadsOnline, the number of NYPD visits to the Queens location increased to three or four per week. (Cabrera Dep., Dkt. 45-2, at ECF 265.) Meanwhile, Robert Santos, EZ Pawn regional manager, testified at deposition that he received calls from EZ Pawn store managers that led him to believe that "as soon as [EZ Pawn] got off [LeadsOnline] it was just like, [the police] would come in more often, they would come in and try to intimidate the managers saying if you don't get this, if you don't get back [on] Leads[]Online, we're going to come back and arrest everyone." (Deposition of Robert Santos ("Santos Dep."), Dkt. 45-3, at

---

[15] In October 2013, Mr. Kaminsky submitted an affidavit in support of Gem Financial Service, Inc.—a pawnbroker-plaintiff in a separate litigation currently pending before the Honorable Margo K. Brodie, U.S. District Judge for the Eastern District of New York. (Kaminsky Dep., Dkt. 45-2, at ECF 223.) In that case, Mr. Kaminsky "explained [that EZ Pawn stores in New York City] were subject to an increased police presence, threats, harassment, and bullying, upon cancellation of their service with LeadsOnline." *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 473.

ECF 305, 307.) When asked about the questions local EZ Pawn managers asked him regarding these interactions with police, Mr. Santos explained:

> The questions would be more of like a frantic call like, what do I do, this guy, he's threatening to arrest me if I don't get back on Leads[]Online or if you don't show him something. I don't know if it would be so much of a question, it would be more like worried, what do I do. That's my take on it.

(*Id.* at ECF 307.) Mr. Santos also testified that local managers contacted him regarding NYPD visits eight to ten times a week during the time periods when EZ Pawn was not using LeadsOnline. (*Id.* at ECF 308.)

### C.    Plaintiff Onwuakor & Defendant Bulzomi

In 2015, Plaintiff Onwuakor received visits from NYPD officers approximately once every three weeks while working as the manager of an EZ Pawn store located on Atlantic Avenue in Brooklyn, NY (the "Brooklyn location"). (Defs.' 56.1, ¶¶ 38, 41; Deposition of Aloamaka Onwuakor ("Onwuakor Dep."), Dkt. 45-2, at ECF 273.) At deposition, Onwuakor admitted that his interactions with NYPD officers took place in the area of the store that was openly accessible to customers, and that the only times the NYPD entered a non-public area of the store was upon explicit invitation. (Defs.' 56.1, ¶¶ 39, 41; Onwuakor Dep., Dkt. 45-2, at ECF 274.)

On July 8, 2015, in the course of an administrative inspection of the Brooklyn location, Defendant Bulzomi discovered that (1) in violation of GBL § 43, the store did not have the required sign with the interest rate; and (2) in violation of GBL § 46, required record book entries were missing. (Defs.' 56.1, ¶ 41.) Before issuing a summons for the violations, Bulzomi checked to see if there were any warrants issued for Plaintiff Onwuakor. (*Id.*) There was, in fact, a warrant

issued for Onwuakor's arrest on the basis of an "expired tag sticker."[16] (Defs.' Aff. & Decl.,

Dkt. 45-3, at ECF 286, 329; Bulzomi Dep., Dkt. 45-3, at ECF 313).[17] At deposition, Bulzomi

described his interaction with Onwuakor on July 8, 2015 as follows:

> I asked to do a pawnshop inspection. I spoke to [Onwuakor], I believe, who was
> behind the counter. Don't remember everything in between, but I do remember
> speaking to him and explaining to him what we were doing, what we needed to do.
> At some point I either got his ID,[18] or he told me his name, date of birth. I mean,
> after that we ended up running his name. I know he had a warrant, active warrant.
> Told him he had the active warrant, told him that there was a violation basically
> with the pawnshop, but mostly he had a warrant that he could take care of. Told
> him to take care of the warrant because he's technically supposed to be arrested
> right now. You have an active warrant, I double checked to make sure it was an
> active warrant. Told him to please take care of it and I'm going to come back and
> please have it taken care of before I come back because, it's for a violation offense,
> it's a moving [traffic] offense.

(Bulzomi Dep., Dkt. 47-3, at ECF 502–03.) When asked why he declined to arrest Plaintiff

Onwuakor on July 8, 2015, Defendant Bulzomi answered that he "felt like being nice and tried to

give [Onwuakor] a chance to clear it up" and that he "tried to use [his] discretion and try to let

---

[16] Though no explanation is given in the record as to what a "tag sticker" is, the Court
surmises, based on the proceedings before the state court, discussed *infra*, that a tag sticker refers
to the vehicle registration sticker required for licensed vehicles in New York.

[17] The arrest warrant identified the offense charged as "VTL04030(01)I." (Defs.' Aff. &
Decl., Dkt. 45-2, at ECF 329.) The Court is unable to discern any such provision in New York's
Vehicle and Traffic Law, which has sections ranging only from 400 through 499, though the Court
observes that New York Vehicle & Traffic Law § 430 governs illegal possession of vehicle
identification numbers. The arrest warrant at issue did *not* identify GBL §§ 43 or 46—the
provisions for which Plaintiff Onwuakor was ultimately arrested—though the Honorable Sharon
Clarke, Judge of the Criminal Court of the City of New York, Kings County, referred to
Onwuakor's arrest warrant as stemming from an "expired tag sticker." (Defs.' Aff. & Decl.,
Dkt. 45-3, at ECF 286.) Deferring to Judge Clarke, the Court concludes that the arrest warrant
was issued on the basis of an expired tag sticker.

[18] Defendant Bulzomi explained: "I don't remember what I saw on July 8th exactly, but I
know that there was a violation because that was the reason why I wanted to see [Plaintiff
Onwuakor's] ID and everything and know his identification." (Bulzomi Dep., Dkt. 47-3, at
ECF 511.)

[Onwuakor] get rid of" the violation. (*Id.* at ECF 504–05.) Before leaving the Brooklyn location, Bulzomi warned Onwuakor that he would return in the next few days. (*Id.* at ECF 509–10.)

Two days later, on July 10, 2015, Defendant Bulzomi returned to the Brooklyn location, along with Sergeant Cecchini and several other NYPD officers, and asked to see the store's log book. (*Id.* at ECF 510, 512, 514.) Because there remained an active warrant for Plaintiff Onwuakor's arrest (Bulzomi Dep., Dkt. 47-3, at ECF 521–22), Bulzomi arrested Onwuakor on charges of "improper pawnbroking record" in violation of GBL § 43 and "usurious loan by pawnbroker" in violation of GBL § 46 (Defs.' Aff. & Decl., Dkt. 45-3, ECF 278–81; Bulzomi Dep., Dkt. 45-3, at ECF 317). Bulzomi stated at deposition that had there not been an arrest warrant for Onwuakor, he would have merely issued Onwuakor summonses for the GBL violations, rather than arrest him. (Bulzomi Dep., Dkt. 47-3, at ECF 521–22.) At arraignment, Onwuakor was offered a violation and time-served for both GBL charges, and was offered an adjournment in contemplation of dismissal ("ACD")[19] with respect to the expired tag sticker. (Defs.' Aff. & Decl., Dkt. 45-3, at ECF 286.) After accepting the ACD offer and declining the other offer, Onwuakor was released on his own recognizance. (*Id.*) On November 19, 2015, Onwuakor's case was dismissed pursuant to New York Criminal Procedure Law § 170.30, all charges against him were dropped, and all related records were sealed. (*Id.* at ECF 296–97, 300.)

## III.  Procedural History

Plaintiffs commenced this action on July 11, 2016, advancing the following claims: (1) Fourth Amendment violation of EZ Pawn's rights as against Defendants NYPD and City of

---

[19] "An ACD is an adjournment in contemplation of dismissal," which meant that "if [Plaintiff Onwuakor] [was] not arrested in six months [after arraignment, then] []his case w[ould] be dismissed and sealed." (Defs.' Aff. & Decl., Dkt. 45-3, at ECF 287.)

New York;[20] (2) Equal Protection violation of EZ Pawn's rights as against Defendants NYPD and City of New York; (3) *Monell* claim against Defendant City of New York predicated on the aforementioned violations; (4) assault, battery, illegal search and seizure, false arrest, malicious prosecution, excessive force, and unlawful imprisonment of Plaintiff Onwuakor as against Defendant Bulzomi; and (5) a claim for attorneys' fees. (Complaint ("Compl."), Dkt. 1, ¶¶ 56–131; Plaintiffs' Memorandum of Law in Opposition to Summary Judgment ("Pls.' Br."), Dkt. 49, at ECF 1431.) During a conference held before the Honorable Steven M. Gold, Magistrate Judge, on October 27, 2017, Plaintiff Onwuakor's claims for assault, battery, and false arrest were withdrawn, but his claims for illegal search and seizure, malicious prosecution, excessive force, and unlawful imprisonment were left intact. (*See* Minute Entry of Oct. 27, 2017 Telephone Conference, Dkt. 30; *see also* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Br."), Dkt. 46, at ECF 393 n.3.) After discovery concluded, Defendants filed a motion for summary judgment (Dkt. 43), which is currently before the Court.

## DISCUSSION

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

---

[20] As discussed *supra*, Plaintiff EZ Pawn is only asserting an as-applied challenge with respect to the statutory and regulatory regime pursuant to which the NYPD conducted inspections of EZ Pawn stores.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the non-moving party is insufficient; "there must be evidence on which the jury could reasonably find for the" non-movant. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted).

When assessing whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

## I. Preliminary Issues

### A. Proper Naming of Defendants

At the outset, the Court addresses the threshold issue of the naming of Defendants with respect to EZ Pawn's Fourth Amendment and Equal Protection claims. EZ Pawn brings Fourth Amendment and Equal Protection claims against Defendants NYPD and City of New York. (Compl., ¶¶ 56–82, 96; Pls.' Br., Dkt. 49, at ECF 1431.) Preliminarily, the Court dismisses the

NYPD from this case, as the NYPD "is not a suable entity." *Somerville v. NYPD*, No. 12-CV-165 (KAM) (JMA), 2012 WL 668926, at *1 (E.D.N.Y. Feb. 29, 2012); *see Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("[Plaintiff] sued the City of New York and the NYPD separately. The district court correctly noted that the NYPD is a non-suable agency of the City.").

In light of this dismissal, EZ Pawn's Fourth Amendment and Equal Protection claims are advanced only against Defendant City of New York. (Compl., ¶¶ 56–82.) But "a municipality can be liable under § 1983 only where its policies are the moving force behind" a separate constitutional violation. *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quotation and brackets omitted). Under this theory of liability established by the Supreme Court in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), "the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation," *Outlaw*, 884 F.3d at 373 (quotation omitted). As the Second Circuit has explained:

> Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality.
>
> It does not follow, however, that the plaintiff must obtain a *judgment* against the individual tortfeasors in order to establish the liability of the municipality. It suffices to plead and prove against the municipality that municipal actors committed the tort against the plaintiff and that the tort resulted from a policy or custom of the municipality. In fact, the plaintiff need not sue the individual tortfeasors at all, but may proceed solely against the municipality.

*Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) (citation omitted).

Thus, to the extent EZ Pawn alleges constitutional violations carried out by NYPD officers who have not been named as defendants in this case—as it has done with respect to its Fourth Amendment and Equal Protection claims (Compl., ¶¶ 56–82)—the Court interprets those

allegations as relevant to establishing constitutional violations underlying any *Monell* claim against Defendant City of New York.

### B. Plaintiffs' Abandonment of Claims

On the instant motion, Defendants argue that all of Plaintiffs' claims should be dismissed. (*See* Defs.' Br., Dkt. 46, at ECF 394 ("Accordingly, the action should be dismissed in its entirety.").) In their opposition brief, Plaintiffs argue against dismissal of only the following claims: (1) EZ Pawn's as-applied challenges under the Fourth Amendment for unlawful searches of its premises and unlawful seizures of its collateral and merchandise; (2) EZ Pawn's selective enforcement claim under the Equal Protection Clause; (3) EZ Pawn's *Monell* claim based on the foregoing constitutional violations; and (4) Plaintiff Onwuakor's malicious prosecution claims, brought under both federal and New York law, against Defendant Bulzomi. (Pls.' Br., Dkt. 49, at ECF 1431, 1435, 1441, 1449, 1450.) To the extent Plaintiffs advanced claims in their complaint that they have not addressed in their opposition brief, the Court has deemed those claims abandoned. *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

## II. Fourth Amendment Violation

Plaintiff EZ Pawn claims a violation of the Fourth Amendment based on (1) visits by members of the NYPD to EZ Pawn stores pursuant to an allegedly unconstitutional administrative scheme, and (2) the placement of holds on items in EZ Pawn stores by members of the NYPD and the NYPD's removal of collateral jewelry[21] from EZ Pawn stores. (Compl., ¶¶ 56–71.) More

---

[21] "Collateral" jewelry and items refers to property left with EZ Pawn as collateral for loans made to the store's customers.

specifically, EZ Pawn asserts that New York City's statutory and regulatory regime governing pawnbrokers and second-hand dealers, as applied, violated its right to be free from unreasonable search and seizure.

In support of their motion for summary judgment, Defendants argue (1) the NYPD officers' visits to EZ Pawn stores do not violate the Fourth Amendment as they were pursuant to an administrative scheme that comports with the requirements for a warrantless inspection of a highly regulated industry; and (2) the claims arising from holds and removal of collateral items fail as they are based on conclusory allegations and lack supporting evidence. (Defs.' Br., Dkt. 46, at ECF 393.) The Court addresses each argument in turn.

## A.    NYPD Visits

"The Fourth Amendment protects against unreasonable searches of commercial premises," *Anobile*, 303 F.3d at 117, and "[o]ne who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of th[e] right to exclude," *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). For this reason, a state actor generally "must obtain a warrant based on probable cause to lawfully execute a search." *Anobile*, 303 F.3d at 117. However, "[t]he Supreme Court has noted that an exception to the warrant requirement applies where the owner or operator of commercial premises in a closely regulated industry has a reduced expectation of privacy, because certain industries have a history of government oversight." *Id.* at 121 (quotations, citation, and ellipsis omitted); *see Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) ("Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." (citation omitted)). In *New York v. Burger*, the Supreme Court advised:

> Because the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy, the warrant and probable-cause

requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search have lessened application in this context. Rather, we conclude that, as in other situations of special need, where the privacy interests of the owners are weakened and the government interests in regulating particular business are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.

The warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made.

Second, the warrantless inspections must be necessary to further the regulatory scheme. . . .

Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

482 U.S. at 702–03 (quotations and citations omitted).

For the purposes of this Order, the Court assumes that pawnbrokers and second-hand dealers are closely regulated industries. Neither party disputes this conclusion and dicta in *Burger* appears to support it. *See id.* at 706 ("In New York, general junkyards and second-hand shops long have been subject to regulation."); *see also Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 495 ("Both parties agree that pawnbrokers and second-hand dealers are closely or pervasively regulated in New York."). However, the Court also holds that a reasonable trier of fact could nevertheless find that the regulatory regime challenged in this case fails to satisfy all three of the aforementioned requirements for a warrantless search within a closely regulated industry to pass

constitutional muster. Assuming, *arguendo*, that the regulatory scheme that governed EZ Pawn during the events at issue in this case furthered a substantial government interest (the first element of the *Burger* test) and that warrantless inspections were necessary to further this regulatory scheme (the second element of the *Burger* test), the Court concludes that a genuine dispute of material fact exists as to whether the regulatory scheme at issue furnished an adequate substitute for the Fourth Amendment's warrant requirement (the third element of the *Burger* test).

Plaintiff EZ Pawn has presented sufficient evidence upon which a jury could find that EZ Pawn was subjected to a regulatory scheme that failed to provide a sufficient substitute for a warrant. In order for a regulatory scheme to provide a constitutionally adequate substitute for a warrant, it "must advise the owner of the property that a search is being made pursuant to the law, and be properly tailored to define the scope of the search and limit the discretion of the inspecting officers." *5 Borough Pawn, LLC*, 640 F. Supp. 2d at 277 (citing *Burger*, 482 U.S. at 703). GBL § 45 authorizes warrantless searches of certain records maintained by pawnbrokers and specifically provides that pawnshop records "shall at all reasonable times be open to the inspection of . . . the superintendent of police, police inspectors, captains of police and police justices of such cities, . . . or of any person who shall be duly authorized in writing for that purpose by any or either of them." N.Y. Gen. Bus. Law § 45. Additionally, the New York City Code requires that pawnbrokers maintain certain records that "shall be open to the inspection of any police officer, the commissioner or any departmental inspector, judge of the criminal court, or person duly authorized in writing for such purposes by the commissioner by any judge of the criminal court, who shall exhibit such written authority to the dealer." N.Y. City Code §§ 20-273(2)(e), 20-277(3)(d).

Most damaging to Defendants' argument, however, is New York City Charter § 436, which does not even purport to limit authorized searches to "reasonable times," empowers NYPD officers to inspect pawnbrokers and second-hand dealers as irregularly or inconsistently as they choose, and punishes refusal to comply with an inspection with "thirty days' imprisonment, or by a fine of not more than fifty dollars, or both." N.Y. City Charter § 436. As the *Gem Financial* court observed,

> [S]ection 436 [of the New York City Charter] provides no meaningful limitation on the discretion of inspecting officers. The statute effectively authorizes searches of not only the entire business premises but also of persons. *See* N.Y. City Charter § 436 ('[I]n connection with the performance of *any* police duties [the commissioner] shall have power to examine such persons, their clerks and employees and their books, business premises, and *any* articles of merchandise in their possession.' (emphasis added)). Rather than provide 'any standards to guide inspectors,' the statute is 'unlimited [in] scope.' [*Donovan v.*] *Dewey*[, 452 U.S. 594, 601 (1981)]; *Liberty Coins*[, *LLC v. Goodman*, 880 F.3d 274, 291 (6th Cir. 2018)]. Pursuant to the plain language of the statute, officers may examine any and all records, whether required to be kept by valid regulatory scheme or not, access the entirety of the premises, whether open to the public or not, and even conduct searches of persons 'in connection with the performance of any [and all undefined] police duties.' N.Y. City Charter § 436; *see also People v. Burger*, 67 N.Y.2d 388, 344 [] (1986) ("§ 436 . . . do[es] little more than authorize general searches . . ."), *rev'd sub nom. Burger*, 382 U.S. at 691 . . . .

298 F. Supp. 3d at 497.

The Court acknowledges that the Grasso Memo does aim to curb the discretion of NYPD searches of pawnshops and second-hand dealers. For example, the Grasso Memo instructs NYPD officers to refrain from selecting a "business for inspection solely because there exists some suspicion that the business is engaged in criminal activity or solely for the purpose of enforcing the criminal law." (Grasso Memo, Dkt. 45-2, at ECF 233.) Moreover, the Grasso Memo instructs NYPD officers that administrative inspections of pawnbrokers and second-hand dealers should "be conducted on a regular basis as part of an ongoing program to enforce licensing and record keeping requirements." (*Id.* at ECF 230.) Indeed, the Grasso Memo's explicit purpose is to ensure

21

that inspections of pawnshops and second-hand dealers do not violate the New York and United States Constitutions. (*See id.* ("[I]n order to [e]nsure that administrative searches of pawnbroker and second-hand dealer businesses conducted by this Department survive constitutional challenge, Department guidelines must [e]nsure that such searches are necessary to further the objective of enforcing the rules and regulations pertaining to such businesses.").)

However, at the summary judgment stage, the mere existence of the Grasso Memo does not provide a sufficient basis for finding in Defendants' favor. EZ Pawn has presented ample evidence to create a genuine dispute of material fact as to whether or not the Grasso Memo effectively circumscribed the discretion of NYPD officers' searches of EZ Pawn premises such that the regulatory regime to which EZ Pawn was subjected constituted an adequate substitute for a search warrant.[22] *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (noting that, when "viewing the evidence" on summary judgment, "the court must assess the record in the light most favorable to the non-movant and draw all reasonable inferences the non-movant's favor" (quotation and brackets omitted)). Specifically, Plaintiffs have presented sufficient evidence to create a triable issue of fact as to whether or not the foregoing statutory and regulatory regime subjected EZ Pawn to unreasonable searches in the form of NYPD visits. Evidence adduced in discovery shows that the NYPD often made unannounced visits to EZ Pawn stores at random times. (Bulzomi Dep., Dkt. 47-3, at ECF 493; Cecchini Dep., Dkt. 47-4, at ECF 592.) Ms. Cabrera testified that, during the time periods from 2009 to 2015 in which EZ Pawn was using LeadsOnline, NYPD officers came to the Queens location twice a week, and during the time periods in which EZ Pawn was not using LeadsOnline, the NYPD visits to the Queens location increased to three

---

[22] It is worth noting that the Grasso Memo is merely a "*non-binding* 'guideline'" and "is not even binding on the officers themselves, let alone [New York City Charter §] 436." *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 498 n.38 (emphasis in original).

or four per week. (Cabrera Dep., Dkt. 45-2, at ECF 265.) Mr. Santos, regional manager of multiple EZ Pawn stores, testified that local managers like Ms. Cabrera contacted him regarding NYPD visits eight to ten times a week during the time periods in which EZ Pawn was not using LeadsOnline. (Santos Dep., Dkt. 45-3, at ECF 308.) And Plaintiff Onwuakor testified that the Brooklyn location received visits from NYPD officers approximately once every three weeks in 2015. (Defs.' 56.1, ¶ 38; Onwuakor Dep., Dkt. 45-2, at ECF 273.)

During the course of these recurring, randomly timed, and unannounced visits, NYPD officers checked to confirm that the EZ Pawn store at issue had "the proper signage, . . . proper descriptions of items, [and] serial numbers of phones," and would check to ensure that the store was "properly marking things, [that] they [were] taking pictures of the items and things of that nature." (Cecchini Dep., Dkt. 47-4, at ECF 589.) Deposition testimony indicates that harassing comments and threats of arrest frequently accompanied these visits. (*See* Kaminsky Dep., Dkt. 45-2, at ECF 218; Santos Dep., Dkt. 45-3, at ECF 307.)

Accordingly, on the record before the Court, Plaintiff EZ Pawn has sufficiently demonstrated a Fourth Amendment violation based on NYPD visits to its stores to defend against Defendants' summary judgment motion. *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2447, 2456 (2015) (holding that local ordinance requiring "every operator of a hotel to keep a record containing specified information concerning guests and to make this record available to any officer of the Los Angeles Police Department for inspection on demand" failed to provide an adequate substitute for a search warrant because the ordinance "fail[ed] sufficiently to constrain police

officers' discretion as to which hotels to search and under what circumstances" (quotations omitted)).[23]

## B.     Placement of Holds & Removal of Jewelry

EZ Pawn contends that Defendants, without a warrant, "ordered that EZ [Pawn] place on 'police holds' [] various jewelry lawfully in their possession and that such demands effectively served as a confiscation and an illegal seizure under law." (Compl., ¶ 59.) "A seizure occurs when there is some meaningful interference with an individual's possessory interest in that property." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004). An individual's interest in property includes "not only the right to actual possession of a thing, but also the right to exclude others from possessing it, the right to use it and receive income from its use, the right to transmit it to another, and the right to sell, alienate, waste, or even destroy it." *Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009).

Defendants argue that Plaintiff EZ Pawn does not have a reasonable expectation of privacy in the items that the NYPD seized from its stores. (Defs.' Br., Dkt. 46, at ECF 405.) According to Defendants, because the property at issue in this case "was relinquished by an EZ Pawn customer in a pawn or sale transaction," EZ Pawn had no reasonable expectation of privacy in the items seized. (*Id.*) The Court disagrees. "[T]he pawnbroker, as pledgee, has a legitimate possessory interest in [its] property as against the rest of the world except the person having title to the property." *G & G Jewelry, Inc. v. City of Oakland*, 989 F.2d 1093, 1098 (9th Cir. 1993).

---

[23] The Court observes that the facts of this case resemble those at issue in *Patel.* For example, the ordinance in *Patel* provided that "[a] hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot." 135 S. Ct. at 2452. The same is true of the challenged regulatory regime in this case. *See* N.Y. City Charter § 436. "The Court has held that business owners cannot reasonably be put to this kind of choice." *Patel*, 135 S. Ct. at 2452 (citing *Camara v. Mun. Ct. of City & Cty. of S.F.*, 387 U.S. 523, 533 (1967)).

EZ Pawn therefore had "a reasonable expectation of privacy in the pledged items" it received from customers. *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 482. And because there is no evidence that EZ Pawn "voluntarily abandon[ed] property" to the NYPD, the Court cannot conclude that EZ Pawn "forfeit[ed] any reasonable expectation of privacy that [it] might have had in" the pledged items it received from customers. *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990).

Additionally, Defendants argue that EZ Pawn has failed to provide information as to where or under what circumstances holds were placed and items were removed. (Defs.' Br., Dkt. 46, at ECF 405.) This is incorrect. Plaintiffs presented the following evidence in discovery. Mr. Kaminsky indicated, via sworn affidavit, that during the events at issue in this case, EZ Pawn "often got many [] notices from the police department with demands to 'Hold' or directives for Police Confiscation." (Pls.' Aff. & Decl., Dkt. 47-1, at ECF 425.) In deposition, Mr. Kaminsky explained that one of these holds was placed on a Rolex watch. (Kaminsky Dep., Dkt. 45-2, at ECF 218.) Additionally, Ms. Cabrera estimated in deposition that she had been asked to place a hold on items at the Queens location about six times since 2013. (Cabrera Dep., Dkt. 45-2, at ECF 262, 264.) Moreover, there exists in the record an electronic summary of EZ Pawn holds and confiscations that were implemented by the NYPD from 2014 through 2015. (Ex. I, Defs.' Aff. & Decl., Dkt. 45-2, at ECF 252–57.) Indeed, this summary comes from the NYPD's *own* records. The summary enumerates the many holds and confiscations—collectively in excess of thirty—that the NYPD placed on items in EZ Pawn stores in 2014 and 2015, and provides the specific dates on which these holds and confiscations were implemented. (*Id.*)

This evidence suffices to create a triable issue of fact as to whether the NYPD's holds on and removal of various items from EZ Pawn stores constituted unreasonable seizures under the Fourth Amendment. Defendants note that the NYPD summary is "devoid of information about

the circumstances in which the holds were placed or items were seized from EZ Pawn stores," and "the information on the only seizure identified by EZ Pawn was limited to identifying the item as a Rolex watch belonging to a customer and that it was wrongly seized." (Defs.' Reply Mem. of Law in Further Supp. of Summ. J., Dkt. 52, at ECF 1514.) It is true that a party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*, 375 F.3d 196, 200 (2d Cir. 2004) (quotation omitted). But the conclusory assertions made by Plaintiffs that Defendants insist the Court reject are *factual* conclusions, not legal ones. And because Plaintiffs have referenced admissible evidence in support of their factual conclusions—including, *inter alia*, deposition testimony from EZ Pawn employees and the NYPD's own summary of holds on and confiscations of EZ Pawn merchandise—the Court rejects Defendants' argument that Plaintiffs' evidence is insufficient at the summary judgment stage. *See Net Jets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 179 (2d Cir. 2008) ("[I]n deciding a party's summary judgment motion, the district court is required to view the record in the light most favorable to the party against which summary judgment is sought.").

Accordingly, the Court holds that, at the summary judgment stage, EZ Pawn has produced evidence that could enable a reasonable trier of fact to conclude that the NYPD's holds on, and confiscation of, merchandise from EZ Pawn stores violated the Fourth Amendment.[24]

---

[24] In support of their argument that the NYPD's placement of holds on, and removal of, jewelry at EZ Pawn stores did not violate the Fourth Amendment, Defendants invoke the "plain view" and consent exceptions to the warrant requirement. (Defs.' Br., Dkt. 46, at ECF 404–05.) However, other than reciting boilerplate legal standards relating to exceptions to the warrant requirement—*e.g.*, "a warrantless search and seizure is not 'unreasonable,' if, among other reasons, the plain view or consent exception to the warrant requirement applies" (*id.* at 404–05)—Defendants utterly fail to explain why these exceptions should apply under the circumstances of this case. And the Court is not obligated to do defense counsel's job. *See McAnaney v. Astoria*

26

## III. Equal Protection Violation

Additionally, Plaintiff EZ Pawn alleges that Defendants violated its rights under the Equal Protection Clause, because Defendants "effectively singled out EZ [Pawn] from other pawnbrokers voluntarily using [LeadsOnline] and have done so with malice and bad faith" in order to "punish EZ [Pawn] in retaliation for [its] refusal to cede to the NYPD's illegitimate demands." (Compl., ¶¶ 73–74.) Defendants argue that they are entitled to summary judgment on this claim because it "rests on conduct that does not violate the Constitution and the differing treatment was based on a material distinguishing factor, the use or non-use of LeadsOnline." (Defs.' Br., Dkt. 46, at ECF 407–08.) "To prevail on a claim of selective enforcement" under the Equal Protection Clause,

> plaintiffs in this Circuit traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (quotations omitted).

The Court holds that EZ Pawn has failed to produce sufficient evidence that would allow a reasonable jury to conclude that its Equal Protection rights were violated. Assuming, *arguendo*, that EZ Pawn has demonstrated that it was treated differently from other pawnbrokers and second-hand dealers because it stopped using LeadsOnline, EZ Pawn has failed to create a triable issue of fact with respect to the second prong. "The branch of equal protection law that protects individuals

---

*Fin. Corp.*, 665 F. Supp. 2d 132, 177 n.43 (E.D.N.Y. 2009) (declining to "scour the entire record, including all memoranda, declarations and evidentiary submissions to manufacture an argument" on a litigant's behalf). In any event, it appears that these exceptions would not properly apply in this case. *See Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 486–90 (holding that a reasonable jury could conclude that the plain-view and consent exceptions should not apply to plaintiff-pawnbroker's Fourth Amendment claims stemming from police seizures of merchandise).

from unequal treatment motivated by malicious or bad faith intent to injure provides protection from adverse governmental action that is not motivated by legitimate governmental objectives." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005) (quotations omitted). "If the motivation to punish is to secure compliance with agency objectives, then by definition the motivation is not spite, or malice, or a desire to get someone for reasons wholly unrelated to any legitimate state objective." *Id.* (quotations and brackets omitted). EZ Pawn itself alleges that the differential treatment it was subjected to arose from EZ Pawn's refusal to accede to the NYPD's demand that it use LeadsOnline. (Compl., ¶¶ 73–74.) Therefore, EZ Pawn's "selective enforcement claim fails as a matter of law because the NYPD desired to implement LeadsOnline, as both parties agree, in order to promote law enforcement purposes—a legitimate governmental objective." *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 502.[25]

Accordingly, the Court concludes that EZ Pawn has failed to produce evidence from which a reasonable trier of fact could conclude that its Equal Protection rights were violated.

## IV. *Monell* Claim

Plaintiff EZ Pawn brings a *Monell* claim against Defendant City of New York for implementing a municipal policy that led to the violation of EZ Pawn's constitutional rights. (Compl., ¶¶ 83–90.) "A municipality may be liable under § 1983 only if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quotations omitted). "[T]he

---

[25] As the *Gem Financial* court observed, "[w]hile the *methods* employed in achieving such an objective may themselves constitute Fourth Amendment violations, they are not the basis for an Equal Protection selective enforcement claim." 298 F. Supp. 3d at 502 (emphasis in original). This Court further notes that had the NYPD, in fact, arrested an EZ Pawn employee for not using LeadsOnline—as was allegedly threatened by an unidentified NYPD officer (Santos Dep., Dkt. 45-3, at ECF 307)—that conduct might support a false arrest claim.

elements of a *Monell* claim include: 1) an official policy or custom that, 2) causes the plaintiff to be subjected to, 3) a deprivation of a constitutional right." *Musso v. City of New York*, No. 05-CV-2511 (RRM) (JO), 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1987)). Because the Court has, *supra*, held that EZ Pawn has produced evidence from which a reasonable trier of fact could conclude that its Fourth Amendment rights were violated, the Court deems the second and third elements satisfied and addresses the first element: an official policy or custom. To demonstrate an official policy or custom, a plaintiff must show "the existence of a formal policy which is officially endorsed by the municipality," or a practice that is "so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from the evidence of deliberate indifference of supervisory officials as to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order) (citing *Jones v. Town of East Haven*, 691 F.3d 72, 80–81 (2d Cir. 2012)).

The Court concludes that Plaintiff EZ Pawn has produced evidence from which a reasonable trier of fact could find that the NYPD operated under a municipal policy or custom that directly caused a violation of EZ Pawn's Fourth Amendment rights. Defendants argue that the "conclusory allegations as to the placement of holds [] and removal of collateral items [] do not support the existence of a policy or practice" because "the number of holds and removals was only" six in four years at the Queens location or fewer than two per year "and, thus, not sufficient to support an improper policy or practice." (Defs.' Br., Dkt. 46, at ECF 406.) But, as discussed *supra*, the use of holds and the confiscation of property are not the only grounds for EZ Pawn's Fourth Amendment claim, and there exists sufficient evidence in the record that NYPD officers engaged in warrantless searches and seizures of pawnbrokers and second-hand dealers with

regularity, so as to create a triable issue of fact regarding the NYPD's violation of EZ Pawn's Fourth Amendment rights. New York City Charter § 436 empowers NYPD officers to inspect pawnbrokers and second-hand dealers as irregularly or inconsistently as they choose, and punishes refusal to comply with an inspection with "thirty days' imprisonment, or by a fine of not more than fifty dollars, or both." N.Y. City Charter § 436.

The evidence adduced in discovery indicates that, pursuant to this municipal provision, NYPD officers made frequent unannounced visits to EZ Pawn's stores at random times. (Bulzomi Dep., Dkt. 47-3, at ECF 493; Cecchini Dep., Dkt. 47-4, at ECF 592.) Additionally, EZ Pawn has submitted evidence from other pawnbrokers and second-hand dealers in New York City who attest that they were subjected to warrantless holds on, and removal of, merchandise by members of the NYPD. (Pls.' Aff. & Decl., Dkt. 47-2, at ECF 447–54; *id.*, Dkt. 47-5, at ECF 619–20.) The Court concludes that the evidence shows that these warrantless searches and seizures by the NYPD were sufficiently "persistent or widespread as to constitute a custom or usage with the force of law" to enable EZ Pawn's *Monell* claim to withstand summary judgment. *Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quotations omitted).

## V.    Malicious Prosecution Claims

Plaintiff Onwuakor brings malicious prosecution claims against Defendant Bulzomi, under both federal and New York law, based on the officer's arrest of Onwuakor on July 10, 2015 and the events that took place thereafter, culminating in the dismissal of the charges against Onwuakor. (Compl., ¶¶ 91–99.) "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of [his] rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). To state a malicious

prosecution claim under New York law, "a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161 (quotations omitted). In addition to these four elements, a plaintiff asserting a § 1983 malicious prosecution claim must demonstrate a sufficient post-arraignment restriction on his or her liberty. *See Burg v. Gosselin*, 591 F. 3d 95, 98 (2d Cir. 2010) (finding that "the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure"). Because Onwuakor has failed to create a triable issue of fact with respect to the malice element—a requirement of both federal and state malicious prosecution—the Court grants summary judgment to Bulzomi on these claims.[26]

The relevant facts underlying Onwuakor's malicious prosecution claims are as follows. On July 10, 2015, Bulzomi arrested Onwuakor on misdemeanor charges of "improper pawnbroking record" in violation of GBL § 43 and "usurious loan by pawnbroker" in violation of GBL § 46. (Defs.' Aff. & Decl., Dkt. 45-3, ECF 278–81, 290; Bulzomi Dep., Dkt. 45-3, at ECF 317). At arraignment, Onwuakor was offered a violation and time served for both GBL charges. (Defs.' Aff. & Decl., Dkt. 45-3, at ECF 286.) After declining the offer, Onwuakor was released on his own recognizance. (*Id.*) On November 19, 2015, Onwuakor's case was dismissed pursuant to

---

[26] To the extent Plaintiff Onwuakor's malicious prosecution claims rest on the charge for the expired tag sticker, such a claim fails because that charge was terminated pursuant to an adjournment in contemplation of dismissal or "ACD." (Defs.' Aff. & Decl., Dkt. 45-3, at ECF 286.) *See Bynum v. Doe*, No. 16-CV-6332 (KAM) (ST), 2019 WL 1259568, at *4 (E.D.N.Y. Mar. 19, 2019) ("[I]t is settled law in the Second Circuit that an ACD under N.Y. Crim. Proc. Law § 170.55 is not a favorable outcome for purposes of malicious prosecution claims." (citing *Green v. Mattingly*, 585 F.3d 97, 103 (2d Cir. 2009); *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)).

New York Criminal Procedure Law § 170.30, all charges against him were dropped, and all related records were sealed. (*Id.* at ECF 297, 300.)

Even accepting Plaintiff Onwuakor's version of the facts, there is insufficient evidence in the record to create a triable issue of fact as to whether Defendant Bulzomi possessed the requisite level of malice to sustain a malicious prosecution claim. A plaintiff asserting a malicious prosecution claim must show that the defendant acted out of "a wrong or improper motive, something other than a desire to see the ends of justice served." *Fulton v. Robinson*, 289 F.3d 188, 198 (2d Cir. 2002) (quotations omitted). At deposition, Bulzomi explained that he chose to arrest Onwuakor on July 10, 2015 because there remained an active warrant for Onwuakor's arrest based on an expired tag sticker—a fact that Onwuakor does not dispute—and that had there not been such a warrant, Bulzomi would have merely issued Onwuakor summonses for the GBL violations. (Bulzomi Dep., Dkt. 47-3, at ECF 521–22.)

Although Plaintiffs contend that Bulzomi arrested Onwuakor to punish EZ Pawn for discontinuing use of LeadsOnline (Pls.' Br., Dkt. 49, at ECF 1452–53), they present no admissible evidence supporting this contention. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) ("[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." (quotation omitted)); *Blount v. Swiderski*, No. 2:03-CV-23 (ENV) (ETB), 2006 WL 3314635, at *18 (E.D.N.Y. Nov. 14, 2006) (rejecting notion "that a plaintiff may overcome a summary judgment motion based simply on general and conclusory allegations"). And because actual malice is a required element of both federal and New York malicious prosecution claims, Plaintiff Onwuakor's state-law claim is dismissed as well. *See Nardelli v. Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978) ("A necessary element of the cause of action of malicious prosecution is 'actual malice' or 'malice in fact,' . . . [which] means that the defendant

must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." (citation omitted)).

Accordingly, the Court grants summary judgment to Defendant Bulzomi on Plaintiff Onwuakor's § 1983 and state malicious prosecution claims.[27]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is *granted* with respect to: (1) Plaintiff Onwuakor's federal and state malicious prosecution claims against Defendant Bulzomi, who is no longer a party in this action; and (2) all claims against the NYPD, which also is no longer a party in this action. Summary judgment is *denied* as to Plaintiff EZ Pawn's *Monell* claim against Defendant City of New York based on EZ Pawn's as-applied challenges under the Fourth Amendment for allegedly unlawful searches of EZ Pawn's premises and seizures of its merchandise. This claim shall proceed to trial. The Court deems abandoned, and thus dismissed, Plaintiff Onwuakor's claims for illegal search and seizure, excessive force, and unlawful imprisonment.[28]

---

[27] Defendants additionally argue that: (1) Plaintiff Onwuakor has failed to demonstrate a malicious prosecution claim at the summary judgment stage because "the dismissal in the interest of justice cannot be construed to be a resolution in [Plaintiff] Onwuakor's favor in the absence from the record of evidence of his innocence" (Defs.' Br., Dkt. 46, at ECF 414); and (2) Bulzomi is entitled to qualified immunity because the law is unsettled as to whether an arrest on misdemeanor charges followed by several court appearances, as happened with Onwuakor's criminal case, suffices to constitute a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty as required to sustain a malicious prosecution claim (*id.*). Because the Court grants summary judgment to Bulzomi on Onwuakor's federal malicious prosecution claim on a different ground, it declines to address these arguments.

[28] Plaintiffs' claim for attorneys' fees (Compl., ¶¶ 128–31) is premature at this stage of the litigation, and so the Court defers ruling on it at this juncture. *See Scottsdale Ins. Co. v. United Indus. & Constr. Corp.*, 137 F. Supp. 3d 167, 182 (E.D.N.Y. 2015) (declining to grant request for attorneys' fees as premature because issues remained for trial).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: June 5, 2019
      Brooklyn, New York